We'll call our next case Rizzo v. First Reliance Standard Life Insurance. Rizzo v. First Reliance Standard Life Insurance Rizzo v. First Reliance Standard Good morning. May it please the Court? Joshua Bachrach. I represent the defendant appellant of First Reliance Standard, and I'd like to reserve three minutes of time for rebuttal. Thank you. In this Rizzo lawsuit, we are challenging multiple rulings by the district court in the way it reviewed the evidence as well as whether the claim was allowed to proceed. Judge Sheridan held that there was no need to appeal the denial of benefits. We know what you did, and we know the background, so let's jump in on exhaustion. As to exhaustion, why isn't the clear and mandatory language of the regulation enough to dispatch your argument? Because you have to look at the purpose of the deemed exhausted requirement. And the Supreme Court has told us what that means in Himeshoff v. Hartford Life. And it says that when a claim is deemed exhausted, it allows a person to proceed to court without waiting for a decision. But in that case, that didn't happen. She didn't proceed to court. The decision was made. Hold on. Sorry, Your Honor. Let's start with the regulatory language. It says, in the case of the failure of a plan to follow claim procedures, and there's no question that your client failed to follow claims procedures here, right? It did not make the decision within the required time frame. We take that as a given? That is a given, yes, Your Honor. So, in the case of a failure of a plan to follow claim procedures consistent with the requirements of the section, a claimant shall be deemed to have exhausted the administrative remedies and shall be entitled to pursue any available remedies under Section 502A. Why do we need to go past that language? Why are you talking about the Supreme Court said this or that or the other thing? The Supreme Court in Kaiser says, if the regulation says what it says, that's it. It's the law. You just do it. Why aren't we right there with this mandatory language? Well, because, first of all, we have to look at the purpose of the exhaustion requirement. It serves a lot of important purposes in a risk of cases. I'm not following that. Back to where we were. So, you're out. I apologize, Judge. So, the question is, why does that language not state that if it's deemed exhausted, then there's no need to worry about it? Because we're really talking, I think, about two different things. One is, once it's deemed exhausted, but what does that mean? Does a person, because plans have multiple levels of appeal, which are allowed under risk as well. But this section, and the law seems pretty clear on it, and the regulatory background of this section makes it clear that the industry didn't want it to be this black and white. They pushed back against it, said, don't make it that black and white, and the agency said, no, that's what we're doing. We think, given the strictures associated with compliance with plan requirements, it's the right thing to do to say, you can go to court, and you'll be deemed to have exhausted if the plan doesn't do what it's supposed to do. That's what the regulatory background reads like to me. So in light of that, it just, I'm struggling with the position that there's something vague or unclear about this regulation that should mean that isn't the end of it. Well, Judge Shorten, it says, as you just said, you could go to court. But if you don't, then why do you get the benefit of that deemed exhausted language? She did go to court. Excuse me? She did go to court. Not before the decision was made, and the decision was made and included appeal rights. And, Your Honor, there are cases, and all of the cases have held that in a situation like this, that if you don't take advantage of that right to go to court, then you've waived it. That's the Dragas case. The Dragas case. I'm glad you brought that up. Hold on. Let's deal with it, because you refer to that case, and you characterized it in your briefing. But the way you characterized it is as if Dragas said, oh, if they go to court, if you don't go to court before they render a decision, then you're out of luck. You're not exhausted. That isn't what Dragas said. That's correct, Your Honor. It dealt with a different issue, but the Tyndall Hall and Wilson case. Dragas wanted de novo reviewed. Exactly. That's what the case was about. Yes, Your Honor, Judge Smith. They wanted a remedy based on the failure to render a timely decision, and the Seventh Circuit said you don't get that. The Seventh Circuit never said, wait a second, you had to have exhausted, because she did exhaust. Dragas doesn't have anything to do with exhaustion. She exhausted. It's all about standard of review. So how does Dragas advance your case at all? I think it does, Your Honor, because they said if you want a remedy based on the timing of the decision and when that decision was made or if it was late, you had to raise it at the time the issue arose. And if you didn't, it's too late. No, no, no, no. It didn't say it's too late. All it said was as a matter of historical fact, there is a decision now, and because there is a decision, here's the standard of review that's applicable. So maybe we'll disagree to disagree on whether Dragas is actually saying what you said it said in your brief and move to another case. Do you have any other circuit court case that you think says there's some snapback, that if the insurance company fails to comply with the claims procedures and, therefore, under the regulation, you would be entitled to immediate judicial review and be deemed to have exhausted your rights, that the fact that they then later do what they should have done means that it all snaps back and it's now unexhausted? What's your case that says that? Do I have a circuit court case? No, Your Honor. I have three district court cases, Tyndall, Hall, and Wilson. They're from outside of this circuit, but they are on point. The Tyndall case, and I've excerpted a portion of it in my opening brief, can't be any clearer that it's directly on point with this situation, and it deals with the fact that this court has stated, this issue deals with the fact this court has stated that exhaustion, again, it serves important issues. It allows a fully developed record. It allows the named fiduciary to make the decision, and it allows the opportunity for a decision to be made. No question. I don't think anybody's arguing that exhaustion is a worthy thing. I don't know whether my colleagues have any other questions about exhaustion. We're down to about five minutes. I mean, I do, because don't we have to decide whether strict or substantial compliance is required? Well, that's the other point, Your Honor. You didn't strictly comply with it. You blew the deadline. But in the interim, when Rizzo could have gone to court, he didn't. She didn't. She didn't. Well, actually, both. I'm sorry. Yes. Right. He was the beneficiary, but obviously he passed away. But they didn't do that. There's no dispute they could have run to court when you blew the deadline, correct? Yes. Okay. They don't. Then you provide an explanation as to why you're denying. And your argument is there are a bunch of circuit cases that say that's substantial compliance because you gave them reasons, and then that should have invoked the normal process, which is they come back to you and say you're wrong, you shouldn't be denying us, and then you review it, et cetera, and it goes that way, right? Yes, Your Honor. But there are other circuits that say strict compliance is required, and because you didn't strictly comply with the deadline, she is deemed to have or they are deemed to have exhausted, right? That's correct. And now this whole circuit split is not really relevant anymore for cases that occur after, I think, 2018 under the new reg, right? That is correct. Because the new reg takes the position that the strict compliance circuits, not necessarily that they got it right, but the new regulation adopts the position of the strict compliance circuits, right? It's actually interesting, Your Honor, because the original language in the regulation was deemed denied. It then changed in 2001 to deemed exhausted, and then in 2018 it reverted back to deemed denied. So there was a definite reason why they changed that language in 2001. But I think going to your point on substantial compliance, the Perino case out of the 11th Circuit is directly on point on this, and it says that for these violations. And, again, let's think about why we have a futility doctrine, why we have some of these other excuses, and it's because a defendant or a plan has interfered with their ability to effectively appeal the denial of benefits, and that didn't happen here. There was no interference with the right. But I do want to, Your Honor, and Judge Jordan, it looks like you may have a question, but I do want to move on to the other issue here, which was a clear mistake by the district court. Let's get to the merits and talk to us. Assume for the sake of discussion we thought exhaustion is deemed and we're looking at the decision. Is it correct that for a decision to be not arbitrary or in capricious, in other words, for a decision to be sound, it has to not only be one that's justifiable, but one that was by an appropriate process arrived at and therefore justified by an appropriate process, that there's a process component as well as a bottom line, is it appropriate component? I think that's a fair characterization of what this court said in the Noga case recently. I may not have agreed with that approach that was taken there, but that is what the court said. But if you look at what the judge said and what's actually the process that took place here, they are completely different things. The district court in this case said, based on counsel's argument, First Reliance relied entirely on this one April 2013 statement by Dr. Rist, the family practice doctor. It said entirely or almost entirely, but then later in the decision said, First Reliance didn't look at any evidence after April of 2013. And that's wrong. Because of the Boaks REA report? Is that what you're referring to? It's not just the REA report. Well, it is actually. It's beyond that. What else besides that? Okay. Reliance asked that vocational person to get updated information from the cardiologist. This is a cardiology claim. And this was a family practice doctor, Rist. So that vendor then went to the cardiologist who treated him and said, Now, stop right there when you say it went to the cardiologist who treated him. Because you make much of Mr. Moosby's statement. And I could easily be wrong about this. I'm happy to be corrected. But I thought Moosby was not his treating physician. He was in the same practice group. The same practice group. But Cohen was his physician. Cohen was his cardiologist. Cohen didn't say anything about this. Moosby, is there any evidence that Moosby ever laid eyes on this man and had been his treating physician? Yes. He examined him on September 24th. He performed a complete examination on him. Wasn't his treating physician, though, right? He was. At Sure Cardiology? At that, yes, at Sure Cardiology. It is his treating physician. We didn't select him. Not his PCP, but it's his cardiologist at Sure, is that right? Exactly. We didn't select him. And more importantly, if I can continue the point, Your Honor, his own cardiologist who you just mentioned, the one who more or less treated him more often, nowhere is there any record support saying he's disabled. None. So he failed to carry the burden of proof here. But what we do have is the same cardiology group, his chosen doctor does, well, not chosen necessarily, but, you know, from that group, does an examination. He's told that he has no symptoms of dizziness, no cardiac symptoms, no shortness of breath. And that doctor states patient is not on disability for cardiac reasons. This is a cardiac disability claim. What better evidence? And there is more. Well, let's dig into this. Okay. As I read the record, I understood there to be this bulks report that Judge Hardiman referred to and that that has the residual employability analysis. Correct. But that was based solely, is it not, on an excerpt from Nurse Lubrecht's report of May 16, 2013? The initial report from, so there's multiple steps. As I said, this was a continuing process. So that REA was based on that May report. After that happened, then Reliance said, could you go to the doctor? We need updated information to see if there is a change. So it was that vocational. Bulks didn't wait for that. Bulks knew that there was something coming because somebody else in the organization, Ms. Hess, had said there's something else coming. And he went ahead and he issued his report, right? Reliance did or the doctor? I'm sorry, I didn't follow. Issued the REA, the residual employability assessment, knowing that there was supposed to be more information coming in. He just went ahead and did it. Is that not problematic? I mean, if we're looking at was there a sound process here, should that make us go, wait, stop? No, Your Honor, because we then have, after that was prepared, the additional information came in. The additional information is from the treating cardiologist. Came in when? I'm sorry, when? Came in when? The September 27th. Well, but the denial was on the 9th, wasn't it? Exactly. So there's no reason. So you're not waiting for the stuff to come in on the 27th, the denial. On September 9th, first Reliance internal request was made for someone named Dave to provide a copy of the REA report to, quote, help me make a determination of the WAP claim, end quote. And that very same day, Rizzo's WAP claim was internally denied. Well, let me clarify. An REA is not a decision on eligibility. All it is is to say, let me look at their background and say, if there are other occupations that this person can perform. Are you saying the claim was not internally denied on September 9th? It was the decision. All right, so if it's internally denied on the 9th, then it doesn't matter what came in on the 27th. The decision had been made 18 days earlier. But it wasn't. The decision was made on October 9th. That's when the decision was made. Then show us some evidence of a deliberative process within first Reliance between the date it was internally denied on September 9th and the October date you just referenced. Give us some evidence of back and forth as to, we looked at this, we looked at that. Your Honor, I disagree with the characterization that it was denied on the 9th. It's not denied until the decision is prepared. What happened on the 9th? The person is looking at the information at that time, and they're saying, in my opinion, he did not qualify. But then they have to go through. This is Dave, right? And then they have to go through the analysis. Okay, so Dave says, give me the REA report to help me make a determination of the WAP claim. Okay? Right. That's what Dave said, right? Dave didn't say, give me the REA report so I can evaluate it. He said, help me make a determination of the WAP claim, and then that same day Dave said, deny the WAP claim, correct? Dave says that, but then they got additional information. Then what happens after that between then and October, beyond just first Reliance receiving things, because just because your client received things doesn't mean anybody evaluated or deliberated about what to do with it. The decision letter itself states that he did. The decision letter itself states that we received all of the information from both the waiver of premium and the LTD claim between, and I want to get this date right. It said, I believe it was between, I'm forgetting the first date, but then it says through the end. Did they tell us what was received, or it's just a blanket statement that we received? It was a blanket statement, but under the regulations as the district court held, that's all that is required. But the bigger point here, Your Honor, is still this. Under Kosiba v. Merck, the job of the court is to consider all of the evidence in the record and to see if it reasonably supports the decision. It's not just that, which is why I started my question by saying it. It's to look and see whether, not whether the decision is justifiable, but whether there was a process that shows you appropriately arrived at the decision. That's why the questions are all about this process. Let me build on what Jordan just said. Sure. Isn't it the case that Kosiba and Corson don't say that if the file is full of stuff, that that's enough? Those cases say we need to see what the company's review of the file was. And I believe the record shows that all of the information was reviewed. Look, if Dr. If all the information was reviewed, tell us between September 9 and the October date, how do we know what was reviewed? I will go back and look. I may have to do it as supplemental authority, Your Honor, because I don't know that I have that here. But I will do that as supplemental authority. But what I'm saying is if Dr. If the cardiologist came back and said, this guy can't work. Do we think that First Reliance would still have issued the denial a week or two later saying you haven't proven you're disabled? Of course they would have approved the claim. So it was considered, Your Honor. But you have to go back to the fact. It was considered because we should assume it was considered. I mean, that's what I'm pressing you on. I'm just looking for some evidence in the file. If we're going to say this district judge was wrong for citing the risk issue that was then built on by Lubric, which was then built on by the REA report, and Dave says, you know, let me look at this stuff. And then Dave makes the decision. And then we get radio silence from September 9th until the final decision was made. I'm not sure that we should take radio silence to be that the company did any more work. That's what I'm pressing you on. And if that was argued and those issues were raised, they would have been addressed. We would have submitted something or I would have shown something. That wasn't the argument that was made, Your Honor. So we're kind of, you know, he's kind of thrown out everything he can think of against the wall. In fact, in his response brief, counsel has backed away from his own position and said, oh, they relied on this later September report, which he incorrectly states we didn't have at the time. We clearly did. So we didn't have the opportunity to argue some of these issues before the district court. You clearly had the opportunity to argue before the district court that you had an appropriate process. So I think we can take that as a given. But we're well past the argument time here. Let me ask my colleagues if they've got any questions. We'll hear you on rebuttal. You've got three minutes. Thank you very much, Mr. Bachrach. And we'll hear from your opposing counsel. Good morning, Your Honor. May it please the court. Greg Heisler from Heisler. Megan Heisler on behalf of the plaintiff, appellee Jody Rizzo. And why don't we start with exhaustion again. Sure. And address, if you would, the position that Mr. Bachrach has stated that there's, and they say it in their opening brief at page 22, if I remember right, in the reply brief, that there was a period of time, and there was even still time after your client knew about this, where your client could have gone to court and didn't go to court. And in that context, the regulation shouldn't be understood to say it's deemed exhausted. It's a decision by her not to exhaust, and that's got consequences. I take that to be the argument. Sure. Why don't you answer that? Sure. Well, I would start off by looking at the statute itself, Section 1001A and B. It's written by Congress to demonstrate that ERISA is here to protect the public from insurance companies, number one. And that's why they're setting forth all these guidelines. And then you look at the plain language, like Your Honor pointed out, when Mr. Bachrach was up here, it's clear. It says, if they violate, do not maintain, follow their own processes, and do not follow ERISA, then it is deemed, shall be deemed, and you shall have access to the courts. But that's clear that he admitted that she could have gone to court when they were sitting on their hands and not being timely with their response, but you didn't. And we've got Berger v. Edgewater Steel from 1990, where we said that the exhaustion requirement should be strictly enforced. So how do you get around that? Do we have to take this case and bank and reverse Berger to say we didn't really mean it when we said that exhaustion should be strictly enforced? Well, I think Berger was decided differently than the district court. Berger was on a common law approach at looking at futility. The district court here below did not grant our motion on the concept or the issue of futility. They granted it on the issue of failing to follow the regulations. But, I mean, in D'Amico, we said if a claimant fails to exhaust the review procedures, the claimant's action is dismissed as summary judgment. So, I mean, this looks to me a lot like a malpractice. I know it wasn't you. Sure. But predecessor counsel looks like a malpractice case. I mean, predecessor counsel, apparently, who has several New Jersey ethics complaints, filed. Why isn't this just a malpractice case? Well, because it's an ERISA case. We have a client. to address what was set forth in the October 9th letter because he was not alive when it was received. No, but your client could have, once the final, there was still a month left to exhaust. There was still a month left when Jody Rizzo, a beneficiary. And they got really bad advice from a lawyer not to exhaust. A beneficiary, right, a beneficiary. I think there's a distinction. I think she has her own right, and I argued that in my brief, that she had her own right to receive her own administrative remedies. You have Angela Rizzo. Speak to Tyndall. Sure. And the other district court cases that Mr. Bachrach has pressed on us. That say if you wait long enough that they come back and give a decision, then you're back in the administrative loop and you've got exhaust. Right. Well, I read Tyndall, and I understand the rationale behind that, Your Honor, was that it's short-term disability and long-term disability being argued at the same time. The plaintiff in that case had a negative outcome on her short-term disability, asked for an appeal five months later in Tyndall. And it was granted, and they gave her retroactive short-term disability. And then they denied on here. Tyndall said, in effect, look, if the claimant waits for the plan administrator to make a decision, then the claimant should pursue the administrative route to its end. But in Tyndall, there's no dispute, number one, whether or not there was notice. Notice was sent out, and she was engaged in the administrative process and went through the appellate process, and they were there back and forth. And the rationale that the court used in Tyndall was that the plaintiff there requested administrative review five months late, five months after the 180 days. And the court said, well, they granted her that discretion on that issue. They allowed her to do it late, and they didn't grant it. She didn't wait for that, and she didn't take that approach again. And that was, I believe, the thrust behind the rationale there. And that's in the Middle District of Florida. So we're in Tallahassee. And I think in these cases here, the language is clear. I don't know. I always go back to the plain reading of statute. The plaintiff shall be deemed exhausted and shall have access to the courts. I don't think you need to go to the Middle District of Florida to go down there and get that done. And I think that we've got, I mean, if we look at the whole language, it says, a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies on the basis that the plan has failed to provide a reasonable claims procedure. Don't we have to give some effect to that phrase? The plan has failed to provide a reasonable claims procedure. And if that's a requirement, once they've made a decision and sent it to the beneficiary, why is that not a reasonable claims procedure? Well, obviously, the beneficiary would be disappointed with that decision. So, okay, find a lawyer. Look what happened. They denied me my benefits. This is an outrage. My husband passed away. This is an outrage. What do I do? Well, you challenge it. You appeal it. You go through the, you exhaust. It's not complicated. That's what's so hard for me to understand. I agree. I think it's very simple. If they don't, I think if you read the regulation, it's clear. If they're in violation of a risk, and I've cited two in my brief, and I think if you look at this court's decision in Miller, the third is the note adequate of the notice itself. If you look at the October 9th letter under the regulation, and this is raised in the reply brief of First Reliance, if you look at the regulation, it says that the notice has to give you direction on how to properly perfect your claim. And that's lacking in the October 9th of 2013 letter. Keep in mind, Your Honor, that on the issue of summary judgment, right, so from Ms. Rizzo's perspective, she didn't get that until a year after the claim was filed originally. The WOP benefit was filed in March, and it took a year for her to receive that in March of 2014. Well, and when she received it in March, there was still a month available to exhaust. Right, and she had barriers. Her husband, she had to raise a newborn child. She had to work. Twenty-four days is a short period of time. And these cases are all fact specific. And if it had been filed on the 30th or the 50th or even the 80th day, then maybe the district court restarts the clock for exhaustion, right, which is what? That's a 90-day clock? The clock was 180 under the policy. 180. So if she had, you know, if because of all of those difficulties, which are certainly understandable, if she had sought to exhaust on the 175th day, I mean, there's a credible chance the district court would have restarted that 180-day clock, right? Certainly if the district court made a factual finding that the October letter was never received, of course you would restart the clock on the March date when it was received. Sure. I don't know if it was 180 days, but I think in August of 2016, which would have been a year, she did try to get through another, I'm the third attorney, if you will, on this case, but the second attorney, Ms. Dooley from Robins, York, and Jacobus, wrote a letter saying, you know, could you please reconsider? This is what the facts are. And I said we won't. The 180 days is left. Are you allowed to send a letter and engage with the insurance company, and then when it doesn't work out the way you'd like, come back and say deemed exhausted? Well, I guess what I'm saying is in August of 2016, the insurance company didn't want to give her any remedies, and I still maintain, Your Honor, that she, as a beneficiary, is different than Angela Rizzo. When she should have, when she made her claim, she should have gotten her own set of, her own notice of what her rights and remedies were, including a remedy to convert the policy. Well, assume, again, as we asked Mr. Bachrach, for the sake of discussion, that we got past exhaustion. Sure. And we were looking at the merits of this, and speak directly to the argument they pressed vigorously in their briefing, and again from the podium today, that the best evidence here is the statement from Dr. Moosby, that this just, there's not a cardiac issue here. That's not what we're dealing with here. Sure. So, if that's what the insurance company is hearing, how can they be faulted for saying, you could do sedentary work, so you don't qualify? Well, if they reviewed Dr. Moosby's note, two things would come to mind. Foremost, Dr. Moosby said, we don't do physical capacity evaluations. Ms. Hess, and it's cited in my brief, and I apologize for not having it there. He didn't just say that. He said, this doesn't have to do, like, we're not doing this. Right. Because this isn't a case where there's a cardiac issue. No. He said, we don't have them out on disability. That's the cryptic note that I'm talking about. And then when you read the person who was getting that report, right, Ms. Hess, First Reliance, disregards everything she had to say to them. She said, listen, they wouldn't fill out the physical capacity questionnaire. I asked him, he wouldn't do it. And what was the response? All right, well, put everything on hold for 60 days in your REA analysis. So I think that that's a red herring. That was never discussed. If you look at it, and believe me, I spent a lot of time factually going through this record. On September 9th, Dave said, I need something. He gets the REA. The REA report, the bulks report, the REA, under the regulations and the rules and procedures of First Reliance, is to set forth every document it relied on. The only document identified was May 14th, nurse Lubric's note. And the only reference in there is the March, April note from Dr. Riss, where he says he's totally disabled and he shouldn't lift anything over 50, 50 pounds. They certainly have a self-interest in listing all the things they relied on. I mean, when we review Social Security appeals, the ALJ lists chapter and verse, everything in the medical record that was considered. And here you're saying they just, they told us that they relied on one thing. We need, yeah, and that's in the rule. And then even the REA is even violated within their own regulations. Before the REA can be completed, they have to get all the medical evidence has to be reviewed. And before denial, all the evidence has to be renewed. And before denial letter goes out, it has to be reviewed by a manager. And that review didn't happen until November 22nd. So how did that letter go on on October 9th? Sorry. Okay. Have any questions? Nope. Thank you very much. Mr. Backer, we'll hear your rebuttal. Thank you, Your Honor. A few points. First, Dr. Roosevee's opinion was clearly stated and differs from what counsel said. He didn't say that we don't have them out on disability. What the doctor stated is patient is not on disability for cardiac reasons. There's a big difference in that language. But then also said, I'm not filling out this thing. I'm not doing it. I'm not giving you the evaluation you're asking for, which is an evaluation that evidently is required within the insurance company, right? Well, it's not required. We try to get as much information as possible. But when the doctor is saying there's no cardiac disability and we give him a cardiac claim form and he doesn't fill it out. Did Ms. Hess think internally that something more was required? Evidently so, right? Well, that was before this came in. That was before the September report came out. This was after it came in because she said he won't fill it out. Oh, I see what you're saying, Your Honor. No, because what Ms. Hess saw was the doctor saying this is a disability case based on cardiac. There is no cardiac disability according to the doctor. So why do I need a form filled out? Maybe I misread. I thought what she said was he wouldn't fill it out. And she tells Mr. Bolks that, says there's still more stuff. We've got to get something else here because he wouldn't do it. And Mr. Bolks goes ahead and issues the REA anyway. That's not my entire recollection. You may be right, Your Honor. I'll go back and look at that. But, again, I think it's hard because you don't just have that doctor's statement. You have other information on the record, including Mr. Rizzo telling First Reliance that he's exercising and walking and swimming. You have him saying that he's not applying for Social Security because he expects to return to work soon. And Dr. Riz, who they rely on, who said he keeps putting off that date. He'll return to work now. No, it's now. Now it's this time. But he never explains why. And that, you know, the Supreme Court in Norton said you don't have to rely on a treating physician's opinion, especially when they're not a specialist, which the court stated. I'd like to make a few more comments here quickly, if I can. Counsel said that the letter was not in compliance with Arisa. It didn't state what was needed to perfect. The district court ruled against that issue, said that the letter fully complied. Other courts have said, you don't have to spell out exactly what is needed. You only have to state the basis for the decision. How about his argument that, that there's a difference between the insured and the beneficiary and that the insurance company had an obligation to speak to her and tell her what her rights were. Ms. Rizzo. She was the personal representative of Mr. Rizzo. And so as a personal representative, she took over all of his rights, but let's assume that that's correct. Your honor. I think this was the point judge Harvin made by March 6th of 2014 at the very latest. She knew that there's this decision and whether it's to her, she had it. She asked for it. It was given to her. She should have, she had 40 days and she should have done something. Well, and I can honestly tell you, your honor, that if she had said, I can't do it in 30 days. Can you give me more time? I don't know why I didn't see this, but they would have given her more time. Of course they would have, but it wasn't asked. In fact, the only thing she said is I would have converted. She never mentioned anything about wanting to appeal. And if I, I see the time is up. If I can just finish one point, your honor. Yes. I appreciate that. Thank you. So when your honor was talking about the process, you look at the process, because this is under the arbitrary and capricious standard of review, but under all the evidence here, if this was to noble review, and you're looking at Dr. Moussey's report and all this other evidence, this denial is correct. So I just think that you can't overemphasize the process and find a denial that is correct to be arbitrary and capricious when all the evidence points in the other direction. You say all the evidence points in the other direction. It raises one further question in my mind. You give the back of your hand in your briefing to the structural conflict that exists here and say it doesn't matter because there's no other evidence. But doesn't the manner in which this was handled constitute evidence? Can't we look at the process itself and consider that when we're asking how to weigh a structural conflict? Including the many failures to follow your own policies. Well, I think yes. Under the NOGA decision, that is correct, that it can be evidence of it. But at the end of the day, the Supreme Court has said that a conflict of interest, and in NOGA, the court said that this process is just part of the question of whether the conflict... One factor. It's a factor, precisely. And the ultimate question here is, has a disability been proven? And the answer to that is no, Your Honors. Okay. So thank you. Thank you for your time, Mr. Bachrach. Thank you, Mr. Heisler. We've got the case under advisement.